THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN DALE HARDY, Defendant-Appellant.
Fourth District   No. 4—85—0334

Opinion filed March 31, 1986.—Modified on denial of rehearing April 29, 1986.

Daniel D. Yuhas and Timothy M. Gabrielsen, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas K. Leeper, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Patrick T. Curran, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MORTHLAND delivered the opinion of the court:

Defendant was convicted of burglary in violation of section 19—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 19—1), and was sentenced to four years' imprisonment. He appeals, contending that certain evidence and statements attributable to him should have been suppressed due to an alleged illegal seizure in violation of the fourth and fourteenth amendments as well as alleged police coercion in violation of his sixth amendment rights. U.S. Const., amends. IV, XIV, VI.

Defendant was charged by information on November 5, 1984, with one count of burglary. On January 4, 1985, defendant filed two motions to suppress the evidence. A hearing was then held before the circuit court of Adams County concerning the motions to suppress on February 1, 1985.

Testimony elicited at the suppression hearing may be summarized as follows: Sergeant Ronald Lance of the Adams County sheriff's department stated that on November 5, 1984, at about 5:20 a.m., he was on his way to breakfast prior to going on duty when he noticed a pickup truck parked at the northwest corner of Jefferson and Main Streets in Clayton, Illinois. Sergeant Lance noticed one occupant in the vehicle. He recalled that the truck was "sitting in the shadows," partially parked on the paved portion of the street. The motor was running, but the truck's lights were off. Sergeant Lance indicated he was familiar with most of the residents and vehicles in the small town, as he himself was a long-time resident, but that he failed to recognize either the truck or its occupant.

His suspicions aroused, Sergeant Lance turned his unmarked car around, approached the truck, and asked the occupant, the defendant, for some identification. Sergeant Lance was wearing his uniform at the time. Defendant handed Sergeant Lance his driver's license, which indicated defendant lived in Quincy. When asked what he was doing in Clayton, defendant responded he was in town to visit some friends, but he could not name them, nor could he locate where they lived. He stated he was having difficulty with the truck. The truck had no license plates, but the vehicle sticker on the window showed it was reg-

istered to a John Kindhart of Missouri. Defendant told Sergeant Lance that he had borrowed the truck from Kindhart to come to Clayton.

Sergeant Lance then noticed items he classified as antiques, consisting of old furniture and dishes, in the back of the pickup. Defendant stated he had "no knowledge" of those items, and that they probably belonged to Kindhart. Lance informed defendant that there had been several thefts of antiques within the past few days in the Quincy area as well as within the last six months in Clayton. Lance told the defendant that "if he [defendant] didn't mind," he would keep the driver's license while checking out a few places in town to see if they had been broken into. Defendant replied that that was fine, but he was in kind of a hurry to get the truck back to Kindhart. Initially, Sergeant Lance drove a few blocks away, parked out of sight, and shut off his lights to see if the defendant would "run." When it became apparent that the defendant would wait, Lance then checked two homes in town which he knew contained antiques. He found no evidence of break-in or burglary.

Upon his return, Lance apprised defendant that "everything was okay," and asked defendant his destination. Defendant stated he would be going to Taylor to return the truck. Sergeant Lance then asked defendant "if he would consider following [him] to the sheriff's department" in Quincy to have pictures taken of the contents of the truck and answer a few more questions. Defendant stated he would accompany the officer because it was "on his way anyway," but reminded the officer that he was in a hurry to return the truck. Significantly, Sergeant Lance never returned the defendant's driver's license, and never told him he was free to go.

Upon leaving Clayton, Sergeant Lance radioed his dispatcher and instructed that John Kindhart be contacted to confirm ownership of the truck. The dispatcher later related that Kindhart said he had sold the truck to defendant and denied having anything to do with the contents in back.

Upon their arrival in Quincy, defendant was led to a squad room. The door was closed behind him. No one ever informed defendant that he was free to go, and he never inquired whether he could do so. While the defendant was in the room, Lance discussed the morning's events with Sergeant Edward Curliss, who disclosed a tip he received that stolen antiques were being taken out of the county into Missouri. Curliss subsequently accompanied Lance to the squad room for further questioning of the defendant.

Once inside the squad room, Sergeant Lance told the defendant that some of the questions he would ask might be incriminating, and

therefore read him his *Miranda* rights. Defendant indicated he understood the *Miranda* warning, although initially he had difficulty distinguishing what was meant by "persuasion" and "coercion." Sergeant Lance testified he instructed defendant that any cooperation on his part would be reflected in their report to the State's Attorney's office. After being informed of his rights, but before signing the waiver sheet, defendant admitted that he had stolen the items in the truck, and further informed the officers which building in Clayton they had been taken from.

Sergeants Lance and Curliss continued to interrogate the defendant. They were joined by two sheriff's deputies, Ray Neede and Russell Garrison, who were intermittently present in the squad room during questioning. The testimony of Sergeant Curliss and Deputy Sheriff Neede at the suppression hearing essentially duplicated Lance's account of the questioning of the defendant, although Curliss indicated it was only after defendant made his incriminating statements that he was told his cooperation would be noted in their reports. Deputy Garrison, however, was not called upon to testify at the suppression hearing.

Defendant testified he was having trouble with the truck when Sergeant Lance approached, confiscated his license and began questioning him. Defendant stated he felt like he was "under arrest or something" at that time. He also stated he thought he was under arrest when he first got to the police station, although the officers did not so indicate until later. Defendant testified that the officers initially threatened to revoke his probation unless he cooperated. He further related that Sergeant Curliss told him: "I know you're dirty. You might as well come clean."

The motions to suppress the evidence and statements were denied. A motion to reconsider was also denied.

During defendant's bench trial on April 1, 1985, the State called Sergeant Lance, Sergeant Curliss, and Deputy Neede, all of whom reiterated, for the most part, their previous testimony. When the State then called Deputy Garrison as a witness, defense counsel objected, noting he had not been called during the suppression hearing. The record indicates some discussion at trial as to a stipulation allegedly agreed upon at the time of the suppression hearing that Garrison could not testify that day because he was "having medical treatment." Neither the trial judge nor defense counsel had any specific recollection of it. Nevertheless, Deputy Garrison was allowed to testify; he stated he was present for 15 to 20 minutes during questioning of the defendant, but he was not there during the giving of the *Miranda* warning.

■ Defendant contends, initially, that the investigatory stop was in fact a constitutionally impermissible "seizure" without probable cause, and therefore all evidence subsequently obtained should have been suppressed. In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, the United States Supreme Court recognized a narrow exception to certain investigatory stops or seizures of the person which do not rise to the level of full arrests. Two acknowledged justifications support this distinction. First, while a stop is still subject to fourth amendment scrutiny, it involves a lesser intrusion upon individual freedom than a traditional arrest. (392 U.S. 1, 26, 20 L. Ed. 2d 889, 909, 88 S. Ct. 1868, 1882.) Second, a valid and properly limited *Terry* stop serves the legitimate governmental interest of effective crime prevention and detection which, under some circumstances, is substantial enough to outweigh the privacy interests of the individual. Thus, when the intrusion on the person is minimal, and the law enforcement interests outweigh the privacy interests otherwise infringed, a police officer may stop and question an individual when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot ***." (392 U.S. 1, 30, 20 L. Ed. 2d 889, 911, 88 S. Ct. 1868, 1884.) The officer must be able to point to specific and articulable facts which, taken together with the rational inferences therefrom, reasonably warrant the intrusion. (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880; *People v. Fulton* (1979), 68 Ill. App. 3d 915, 923, 386 N.E.2d 605, 661.) In addition, the determination of whether to make a *Terry* stop must be objectively reasonable. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Sections 107—14 and 108—1.01 of the Code of Criminal Procedure of 1963 have codified the *Terry* rules in Illinois. Ill. Rev. Stat. 1983, ch. 38, pars. 107—14, 108—1.01.

■■ While a stop, like an arrest, is considered a seizure for purposes of the fourth amendment, that amendment is not a guarantee against all searches and seizures, but only against *unreasonable* searches and seizures. (*United States v. Sharpe* (1985), 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568.) In *Terry*, the Supreme Court adopted a dual inquiry for evaluating the reasonableness of any investigative stop. Courts are to examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." (*Terry v. Ohio* (1968), 392 U.S. 1, 20, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879.) Thus, by case law and under the Illinois statute, an officer is afforded an opportunity to briefly detain a person for the purpose of investigating possible criminal activity. During an investiga-

tory stop, a person's freedom of movement is necessarily restricted; he is no more free to leave than if he were placed under a full arrest. *People v. Roberts* (1981), 96 Ill. App. 3d 930, 933, 422 N.E.2d 154, 156.

■■ ■ However, the difference between an arrest and a stop lies not in the permissible restraining upon a person's movement or the incompleteness of the seizure, but rather in the length of time the person may be detained and the scope of investigation which may follow the initial encounter. (*People v. Roberts* (1981), 96 Ill. App. 3d 930, 422 N.E.2d 154.) While the brevity of an investigative detention is an important factor in determining whether that detention is unreasonable, courts must also consider the purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. (*United States v. Sharpe* (1985), 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568; see also *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637; *Michigan v. Summers* (1981), 452 U.S. 692, 700 n.12, 69 L. Ed. 2d 340, 348 n.12, 101 S. Ct. 2587, 2593 n.12.) Thus, it is appropriate for courts to examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." (*United States v. Sharpe* (1985), 470 U.S. 675, 686, 84 L. Ed. 2d 605, 616, 105 S. Ct. 1568, 1575.) Still there can be no hard-and-fast time limit for a permissible stop, as that would depend on the particular circumstances. *United States v. Sharpe* (1985), 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568; *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637.

In addition to the length of time, a stop must be appropriately limited as to place and the investigative techniques employed. Professor LaFave, in his treatise on search and seizure, writes:

"It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include *both a request for identification and inquiry concerning the suspicious conduct* of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, *the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises* ***. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use

makes the period of detention unduly long or involves moving the suspect to another locale." (Emphasis added.) 3 W. LaFave, Search and Seizure sec. 9.2, at 36-37 (1978).

The results of the initial stop may arouse further suspicion or dispel the questions in the officer's mind. (1 W. LaFave & J. Israel, Criminal Procedure sec. 3.8, at 298 (1984).) If the latter is the case, the stop may go no further, and the individual should no longer be detained. On the other hand, if the officer's suspicions are confirmed or further aroused, the stop may be prolonged and the scope enlarged as required. (1 W. LaFave & J. Israel, Criminal Procedure sec. 3.8, at 298 (1984).) Illinois courts have held:

"If the officer's suspicions are not allayed within a reasonable time, he must either make an arrest or allow the person to leave." *People v. Roberts* (1981), 96 Ill. App. 3d 930, 934, 422 N.E.2d 154, 157.

Defendant argues that the investigative stop at issue here exceeded the constitutionally acceptable bounds for such a stop. In examining the reasonableness of the stop under the foregoing principles, we must carefully scrutinize each step taken by the officer.

First, it is clear to us that both the initial stop and questioning of the defendant were permissible. Testimony disclosed that Sergeant Lance, a long-time resident of Clayton, noticed a truck parked "in the shadows" while he was on his way to breakfast at 5:20 a.m. before assuming his duties with the sheriff's department. While familiar with most of the residents and vehicles of the small town, Sergeant Lance testified he did not recognize either this particular truck or its occupant. Further, because the vehicle was parked near residential premises, and because it was dark outside, Sergeant Lance was certainly justified in approaching the defendant and requesting identification. Conduct which might be deemed innocuous during daylight hours in residential areas may be viewed otherwise at night. 3 LaFave, Search & Seizure sec. 9.3, at 72 (1978); see also *People v. Ellis* (1983), 113 Ill. App. 3d 314, 446 N.E.2d 1282.

The officer was also justified in his further questioning of the defendant. According to the defendant's driver's license, he did not reside in the Clayton area. The registration sticker on the vehicle indicated ownership was in another person. Defendant stated he was in Clayton to visit friends, but was unable to recall where they lived or even their names. Sergeant Lance then noticed, in plain view in the back of the pickup truck, some old furniture and dishes which he classified as antiques. Lance noted there had been several antique thefts in Quincy within the past few days, and in Clayton within the past six

months, and so informed the defendant.

His suspicions aroused, and defendant's responses having done nothing to allay his concerns, the officer was justified in the further action taken, *i.e.*, leaving the scene and inspecting certain premises he knew contained antiques. However, having found no evidence of burglary in the area, the inquiry then turns upon whether the continued conduct towards the defendant exceeded the constitutionally permissible bounds of a *Terry* stop and in fact became a seizure requiring probable cause.

Defendant relies heavily on *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319, which he contends is factually similar to this matter. In *Royer*, two narcotics officers stopped the defendant at a Miami airport because he fit a "drug courier profile." The officers identified themselves as policemen and asked defendant if he had a moment to speak with them. Upon request, but without oral consent, defendant produced his airline ticket and driver's license, each containing different names. When defendant became visibly nervous, the officers then stated they were in fact narcotics investigators, and asked defendant to accompany them. Defendant said nothing, but went with the officers. At no time did the officers return either the driver's license or airline ticket.

The defendant was then taken to a large storage closet about 40 feet away for questioning while his baggage was retrieved from the airline. When defendant was asked if he would consent to a search, he produced a key and unlocked one suitcase without orally responding. Drugs were found inside, and defendant was arrested.

The plurality opinion in *Royer* held that the defendant had been illegally detained, and that his statements made during the illegal detention were inadmissible. The court reasoned that when the officers identified themselves as narcotics agents, informed the defendant that he was suspected of transporting narcotics, and asked him to accompany them to the police room, "while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [defendant] was effectively seized for the purposes of the Fourth Amendment." (*Florida v. Royer* (1983), 460 U.S. 491, 501, 75 L. Ed. 229, 239, 102 S. Ct. 1319, 1326.) Under the circumstances, police conduct amounted to such a show of official authority that a reasonable person would have believed he was not free to leave. The plurality opinion further stated:

> "The officers had Royer's ticket, they had his identification, and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably

believed that he was being detained. At least as of that moment, any consensual aspects of the encounter had evaporated ***. As a practical matter, Royer was under arrest." 460 U.S. 491, 503, 75 L. Ed. 2d 229, 240, 103 S. Ct. 1319, 1327.

Given that the initial aspects of the stop in our case were appropriate, we must concern ourselves with whether the officer's failure to return the driver's license escalated a proper investigatory stop into an illegal seizure. The officer retained the license at all times, including during the search of the homes in Clayton, the conversation in which the officer requested that the defendant come with him to the station in Quincy, the actual trip to that station, and the time the defendant was in the squad room.

The fact that Sergeant Lance asked defendant "if he would consider following [him]" to Quincy to have pictures taken of the contents of the truck and answer a few more questions suggests voluntary cooperation. Moreover, defendant agreed to accompany the officer because it was "on his way anyway." Still, at no time was the defendant's driver's license returned to him.

■ Defendant testified at the suppression hearing that he complied with the request to accompany Sergeant Lance to Quincy because he felt he was "under arrest or something." However, the test for a seizure or arrest is not that of the subjective belief of defendant; rather, it is whether, considering all of the circumstances surrounding the incident, a reasonable man, innocent of any crime, would have considered himself under arrest. (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877; *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873; *People v. Finklea* (1983), 119 Ill. App. 3d 448, 452, 456 N.E.2d 680, 682; *People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175.) Under this objective test, should the defendant be considered illegally detained, any consensual aspect of his conduct in agreeing to accompany Sergeant Lance would be eviscerated. *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

We note that defendant was never expressly informed that he was under arrest. Defendant was also never told he was free to go. Under such circumstances, a detention has been held to resemble a traditional arrest. (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, *cert. denied* (1982), 459 U.S. 878, 74 L. Ed. 2d 143, 103 S. Ct. 174.) Although the defendant did not request the return of his license or ask if he could leave, that in itself is not dispositive. The record contains nothing to indicate what would have happened had the defendant re-

quested his license and asked to leave.

■ After considering the facts, we believe that the retention at all times of the driver's license puts this matter within the reasoning of *Royer*. While a court should not normally engage in hindsight to determine if a police officer's actions were appropriate, we nevertheless believe that a reasonable person, innocent of any crime, would not have believed he was free to go where a driver's license is retained under the recited facts. The procedure followed here was proper up to the point where Sergeant Lance investigated houses in the area that could have been burglarized. Finding no evidence of criminal activity, the defendant's driver's license, at the very least, should have been returned. If this had been done, Sergeant Lance's request that defendant follow him to Quincy, and defendant's compliance with this request, could have been deemed consensual. However, we believe that a valid *Terry* stop had escalated into an impermissible seizure when the defendant's driver's license was unduly retained.

■ Accordingly, we need not consider the merits of the defendant's other contentions concerning whether there was an illegal custodial questioning at the police station and whether the State's alleged failure to produce a material witness at the suppression hearing violated his sixth amendment right to confront his accusers. Our holding is based only on an unreasonable seizure within the meaning of the fourth amendment, applicable to the States through the fourteenth amendment. Thus, the "fruits" of any illegal seizure or other official illegality, including physical and verbal evidence, are inadmissible against a defendant. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) To be admissible, there must exist some intervening event to break the connection between the official illegality and the defendant's otherwise voluntary statements. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) We see no such intervening act. Moreover, it is well settled that the mere giving of a *Miranda* warning, as was done here, is insufficient to remove the taint of the illegal arrest. *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

Therefore, the statements and physical evidence obtained should have been suppressed, and we reverse and remand.

Reversed and remanded.

WEBBER and GREEN, JJ., concur.