THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SUSAN EARLEY, Defendant-Appellee.

Fifth District No. 5—88—0659

Opinion filed April 19, 1991.

HOWERTON, J., dissenting.

Kenneth R. Boyle, Stephen E. Norris, and Debra A. Buchman, all of State's Attorneys Appellate Prosecutor's Office, of Mt. Vernon, for the People.

Daniel M. Kirwan and John T. Hildebrand, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The State appeals the circuit court's granting of the defendant's, Susan Earley's, motion to quash arrest and to suppress evidence. At the hearing on the defendant's motion, the court considered only the evidence concerning the defendant's arrest; therefore, the sole issue raised on appeal is whether the circuit court's determination, that the police had neither reasonable, articulable facts justifying the stop of the defendant nor probable cause to arrest her, was against the manifest weight of the evidence.

The facts presented at the hearing on the defendant's motion to quash arrest are as follows: Joyce Dillon, the defendant's sister, testified that the defendant and Frank Dunn came to stay overnight at her home on Wednesday, September 16, 1987. The next day, the defendant and Dunn went to Kentucky and returned to Dillon's home on Friday, September 18, 1987, while Dillon was at work. The defendant and Dunn spent Friday evening with Dillon at her home; however, at some time during the evening, the defendant and Dunn went to Carbondale, Illinois, to return a video machine. While the two were gone, Dillon searched their luggage.

Dillon explained that her reason for searching the defendant's and Dunn's luggage was that she and her family were concerned that the defendant had been using drugs over the past few months. Dillon stated that she herself was a recovered alcoholic, that she had been sober for the past seven years, and that she further did not believe in "narcotics and abuse." Dillon testified that she was familiar with persons who were in emotional "flux" due to substance abuse through her affiliation with Alcoholics Anonymous. Because of her

concerns, Dillon decided to search the defendant's and Dunn's luggage for drugs.

Dillon went into the room which the defendant and Dunn were sharing, and she first searched the defendant's train case or cosmetic bag. She stated she went through each bottle and parcel thoroughly, but she found nothing. Dillon next searched a black carry-on tote bag. Inside this tote bag were men's socks and underwear, but when Dillon searched the side pocket of this case, she found five or six small, transparent, heat-sealed plastic packages containing a white powder substance. She also found a rolled-up baggage claim ticket with the packages. Dillon believed these packages contained cocaine, for, as she stated, she doubted anyone would heat-seal baby powder inside such packages. Because there were several bags of the substance present, she decided that one would not be missed and removed it from the tote bag. Dillon did not search the remainder of the luggage in the bedroom, as she had found what she was looking for and because she was concerned that the defendant and Dunn would return shortly.

Dillon went into her kitchen and showed her husband what she had found in the tote bag. They discussed what she had found for several minutes, following which Dillon called her mother in California to ask her mother what she should do. Dillon testified that her mother called Dillon's brother, who was a volunteer at the sheriff's office in Henry County, Illinois. After her mother had discussed the problem with Dillon's brother, Dillon's mother called Dillon and advised her to call the Illinois State Police Headquarters in DuQuoin, Illinois. Dillon called the Illinois State Police somewhere between 9 and 10 p.m. that evening. She told the police that the defendant and Dunn were staying with her and that she had found what she thought was a narcotic in their luggage. The police dispatcher told Dillon that Sergeant Lichliter would meet her at the bank where Dillon worked the next morning.

At approximately 8 a.m. on September 19, 1987, Sergeant Lichliter met Dillon in the bank's parking lot in Carbondale. She explained to Lichliter that she had not seen her sister using drugs, but she suspected drug use, which prompted her to search her sister's and Dunn's luggage. Dillon showed Lichliter the package she had removed from the luggage and gave the bag to Lichliter. Dillon told Lichliter that she had found the substance in the man's tote bag, and that she had not found anything in the defendant's train case. She and Lichliter talked at length, for it seemed to Dillon that Lichliter

wanted to reassure himself that Dillon's actions were not motivated by revenge or other ill feelings towards her sister.

Dillon asked Lichliter not to search her home, and she asked that he attempt to stop the defendant and Dunn on the road in the car. Lichliter asked Dillon when the defendant and Dunn would be leaving, but Dillon did not know. Dillon gave Lichliter a description of the defendant's car, and she admitted that there was a chance that she had given the police the defendant's license plate number. Lichliter told Dillon that he would contact her again.

After Lichliter left Dillon, at about 9 or 9:30 a.m., Dillon received a telephone call at the bank from Special Agent Ed Thrailkill. She gave Thrailkill the same information she had given Lichliter. Thrailkill asked her if she would sign a consent form to search her home, and he said he would come by the bank and see her.

Following Thrailkill's telephone call, Dillon's husband called. He told Dillon that the defendant and Dunn were getting ready to leave and to return to the defendant's home in Kewanee, Illinois. Dillon's husband indicated that the defendant and Dunn planned on stopping by the bank at lunch time to see Dillon and to say goodbye. Dillon said her husband was vague because the defendant and Dunn were present, but that he was trying to tell Dillon that they were leaving.

Shortly after talking to her husband on the phone, Thrailkill again called her. Thrailkill told her that the police were watching her home, and he asked her if there was a reason that the defendant and Dunn would leave. Dillon explained to Thrailkill that her husband had called her and told her that the defendant and Dunn were leaving, but that they were meeting her at the bank for lunch. Dillon admitted on cross-examination that she told the police she thought the luggage she had searched was in the defendant's car.

Dillon met with Thrailkill at the bank just prior to 11 a.m. that morning. He inquired as to where the defendant and Dunn would have gone, but Dillon could not tell him. Thrailkill went to his car and sat for awhile, during which time the defendant and Dunn pulled into the drive-through window of the bank. When the defendant and Dunn did so, Thrailkill pulled his car in front of the defendant's car and Lichliter blocked the car from behind to prevent them from leaving.

Sergeant Ray Lichliter testified that he had been employed by the Illinois State Police for 27½ years. On the morning of September 19, 1987, he was dispatched to see Joyce Dillon at a bank in Carbondale. He arrived at the bank at approximately 8:40 a.m. Lichliter corroborated Dillon's testimony regarding her concerns about her sister,

her suspicion of drug usage, and her subsequent search of the defendant's and Dunn's luggage. Lichliter did not recall Dillon stating that she did not find anything in the defendant's train case, but he did recall her stating that she had found the packet in the man's luggage. Lichliter confirmed that Dillon gave him a packet containing a white substance, which he determined from his past experience to be cocaine. Lichliter testified that he had seen cocaine before and that he had attended drug-identification courses given by the Illinois State Police.

After talking with Dillon, Lichliter contacted the police headquarters and talked to the duty sergeant. The duty sergeant contacted Special Agent Thrailkill at the Division of Criminal Investigation (DCI). The duty sergeant also called Master Sergeant Cook. Subsequently, Lichliter talked to Thrailkill by phone, and he advised Thrailkill of his and Dillon's conversation at the bank. Lichliter told Thrailkill about the evidence he had been given, of his belief that the substance was cocaine, and of the fact that there was more of the substance in Dillon's home.

Lichliter went to Dillon's home, where he met Master Sergeant Cook. When they arrived, the defendant's car was gone. Thereupon, Lichliter contacted Thrailkill through the DuQuoin police headquarters, and Lichliter was told by Thrailkill that the defendant and Dunn had left to return home, but that they might return to Dillon's home. Lichliter patrolled the area for 30 to 45 minutes, and thereafter, he returned to Carbondale. He arrived at the bank about 11:35 a.m., and shortly after he arrived, the defendant and Dunn pulled into the bank. Lichliter drove his car into the bank's drive-through lane and blocked the defendant's car from behind. Lichliter saw Thrailkill pull his car in front of the defendant's car. Lichliter stated that he knew the car that they had blocked was the defendant's, as he had been given a description of the car, he had had the license plate number, and he had run a check on the license plate number through DuQuoin prior to the stop. Lichliter admitted that he did not know what was in the defendant's car at the time of the stop, but that he believed the car contained controlled substances.

Lichliter stated that he asked Dunn for his driver's license when he first approached the car, but that after that, Thrailkill took over the investigation. Thrailkill told Dunn why the police had stopped the car. Within 10 minutes of the stop, the defendant's car was pulled over and out of the lane of traffic, and Lichliter secured the keys to the defendant's car. The defendant and Dunn stayed within the immediate vicinity of the car. Lichliter heard Thrailkill ask Dunn if he

would consent to a search of the car, and Dunn refused, at which time Thrailkill stated that he would obtain a search warrant. According to Lichliter, the defendant and Dunn were free to leave, they were not handcuffed, and they were not told they were under arrest. Lichliter also stated that after the defendant and Dunn were stopped, a field test was conducted upon the substance contained in the plastic package given to him by Dillon, and at 12:15 p.m., the substance was determined to be cocaine.

Edwin Thrailkill testified that he had been an Illinois State Police officer with the Division of Criminal Investigation for over 10 years. Thrailkill was contacted on his "beeper" around 9:30 a.m. on September 19, 1987, and he was told to contact Sergeant Lichliter regarding a drug possession. Thrailkill contacted Lichliter, who informed Thrailkill that the defendant was suspected of possessing cocaine. Lichliter told Thrailkill that the defendant's sister was the source of his information.

After talking to Lichliter, Thrailkill contacted Master Sergeant Cook. Cook told Thrailkill to go to the bank and get Dillon's consent to search her home, following which Thrailkill was to meet Cook and Lichliter at Dillon's residence. Thrailkill met Dillon at the bank at approximately 11 a.m., at which time Dillon told Thrailkill that her husband had called her. Dillon's husband had informed her that the defendant and Dunn had packed up their suitcases and had left the house, but that they had indicated they were going to come to see her at the bank before they left for the defendant's home in Kewanee. Dillon also told Thrailkill about her search of the luggage and her discovery of the package that she believed contained cocaine. Thrailkill stated that Lichliter had told him that Dillon had given Lichliter the package, but Lichliter had not told Thrailkill what he thought the package contained. Thrailkill further stated that Dillon gave him a description of the defendant's car and had given him the car's license plate number.

At about 11:35 a.m., Thrailkill saw a car matching the description given to him by Dillon arrive at the bank. Dunn was driving and the defendant sat in the passenger seat. His testimony regarding the blocking of the defendant's car, and his actions and statements when he approached the car corresponded to Lichliter's testimony, *i.e.*, that he explained to the defendant and Dunn that the police had information that there was a possibility of narcotics in the car, and that he sought Dunn's permission to search the car. He too testified that the defendant's car was moved after the defendant and Dunn got out of the car, and that they were asked to stay out of the car. Thrailkill

stated that it was at his request that the package in Lichliter's possession was tested. Thrailkill also stated that the defendant and Dunn were not placed in handcuffs, were not told they were not free to go, and were not told they were under arrest. According to Thrailkill, he told the defendant and Dunn that he would take them to the police department, where they would be more comfortable while they waited for him to obtain a search warrant to search the defendant's car. At the police station, the defendant and Dunn were not booked, but they were fingerprinted.

Thrailkill testified that Lichliter did not differentiate in whose luggage the package containing cocaine was found. However, Thrailkill recalled that Dillon said she found five or six packages in the man's luggage. Thrailkill admitted that he did not know for certain if the luggage containing the cocaine was in the defendant's car; however, he reasonably believed that the suitcases containing the cocaine would be in there, since the defendant and Dunn were leaving for their home.

Based on the foregoing evidence, the circuit court entered a written order on October 19, 1988, in which the court found that, at the time of the stopping of the defendant's vehicle, the defendant was under arrest. The court further found that the police lacked either sufficient articulable facts to effectuate a stop or probable cause to effectuate an arrest. It is from this order that the State appeals, contending that the court's determination is against the manifest weight of the evidence. Because of our ensuing disposition of the probable cause issue, it is unnecessary for this court to consider whether the police had specific articulable facts to stop the defendant's car.

██ Section 107—2(1)(c) of the Code of Criminal Procedure of 1963 provides that a police officer may make a warrantless arrest where he has "reasonable grounds" to believe that a person is committing or has committed an offense. (Ill. Rev. Stat. 1987, ch. 38, par. 107—2(1)(c).) The term "reasonable grounds," as it is used in section 107—2, has been held to have the same substantive meaning as "probable cause." (*People v. Waddell* (1989), 190 Ill. App. 3d 914, 546 N.E.2d 1068.) Thus, to make a warrantless arrest, a police officer must have probable cause to do so. Whether there is sufficient probable cause to arrest rests upon the totality of the circumstances and the facts known to the officers and the court. (*Waddell*, 190 Ill. App. 3d 914, 546 N.E.2d 1068.) Probable cause is not proof beyond a reasonable doubt, but means only that there is a probability of criminal activity. (*Waddell*, 190 Ill. App. 3d 914, 546 N.E.2d 1068.) Probable cause is not based upon legal technicalities but is governed by

practical and commonsense considerations upon which reasonable and prudent men would act. *Waddell,* 190 Ill. App. 3d 914, 546 N.E.2d 1068.

■■ ■ In making the determination of whether an officer had probable cause, the officer's factual knowledge, as well as his prior law enforcement experience, is relevant. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) The facts a police officer relies on need not have been personally observed by him, but may be based upon hearsay, such as may be provided by an informant. (*Tisler,* 103 Ill. 2d 226, 469 N.E.2d 147.) Where officers are working together in an investigation, the knowledge possessed by each officer is considered the knowledge of all, and even if the knowledge has not been told to the arresting officer, it may be considered by the court in determining if probable cause exists, as long as the information was placed in the record. (*People v. Fox* (1987), 155 Ill. App. 3d 256, 508 N.E.2d 475.) A court's finding of probable cause, or lack thereof, will not be overturned on appeal unless it is manifestly erroneous. *Fox,* 155 Ill. App. 3d 256, 508 N.E.2d 475.

■■ Where the facts a police officer relies upon for probable cause were provided by an informant, the informant's former reliability must be established or the information must be independently corroborated. (*People v. Sain* (1984), 122 Ill. App. 3d 646, 461 N.E.2d 1043; *People v. Jones* (1983), 119 Ill. App. 3d 615, 456 N.E.2d 926.) However, where the informant is a private citizen, the informant's prior reliability and independent corroboration are unnecessary, and a warrantless arrest based upon the information provided by that informant is justified if there is a fair probability a crime is being or has been committed. (*Jones,* 119 Ill. App. 3d 615, 456 N.E.2d 926.) A person is presumptively a citizen informant if he has never given information to the police in the past and is not a professional police informant. *Jones,* 119 Ill. App. 3d 615, 456 N.E.2d 926.

■■ Here, the court held that the defendant was arrested at the time of the stop. It has been held that an arrest occurs at the time the police inform a defendant of a violation, the defendant submits to the police's control, and it is clear that the police intend to arrest the defendant and the defendant understands that he is being arrested. (*People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287.) Under certain circumstances, such as where a defendant has never been expressly told he was under arrest or where he has not been told he was free to go, the detention of the defendant has been held to resemble a traditional arrest. (*People v. Hardy* (1986), 142 Ill. App. 3d 108, 491 N.E.2d 493.) In determining whether a person has

been arrested, the reasonableness of an officer's conduct is not dispositive, but the circumstances surrounding the incident must also be considered to determine if a reasonable, innocent person would have believed he was under arrest or free to leave. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.) In considering the surrounding circumstances of the stop of the defendant's car presented here, we agree with the circuit court that the defendant was under arrest at the time her car was stopped. This is so, as a reasonable, innocent person in the defendant's situation would have believed that he was unable to leave since the defendant did not have access to her car, the defendant was informed at the time of the stop of the police's belief that narcotics were contained in the car, and the defendant was not told she was free to leave. Thus, the fact that the defendant was not told she was under arrest was not dispositive, for a reasonable person would have believed himself under arrest under these circumstances.

However, we find that the circuit court's determination that the police lacked probable cause to arrest the defendant was manifestly erroneous. Here, the defendant's sister, a citizen informant, told the police that she believed the defendant was using narcotics, that she had searched the luggage contained in the room in which the defendant was staying, and that she had found a substance which she believed to be cocaine in the luggage. Dillon had given the police the packet of the narcotic prior to the stop, and Lichliter, through his prior experience with cocaine and through his drug-identification training, reasonably determined that the substance Dillon found in the luggage was cocaine. Dillon told the police that the defendant and Dunn had left her home to return to the defendant's home, and it was more probable than not that the defendant had placed the luggage containing the cocaine in her car. Dillon had described the defendant's car to the police and had provided her license plate number, which was corroborated through a check on the defendant's license plate. These facts possessed by the police prior to the stop provided sufficient probable cause for the police to arrest the defendant for the possession of a controlled substance. As was stated previously, probable cause is not proof beyond a reasonable doubt but is a matter of probabilities, and here, the probabilities were strong that the defendant was committing a criminal offense. Therefore, we reverse the circuit court's ruling that the police lacked probable cause to arrest the defendant at the time the police stopped the defendant's car.

For the foregoing reasons, the judgment of the circuit court of Jackson County granting the defendant's motion to quash arrest is reversed, and this cause is remanded to the circuit court for further proceedings consistent with the ruling of this court.

Reversed and remanded.

WELCH, J., concurs.

JUSTICE HOWERTON, dissenting:

The sole question in this case is whether the police had probable cause to believe that defendant had committed the crime of illegal possession of cocaine. The facts from which defendant's possession of cocaine can be inferred are these:

(1) Defendant shared a bedroom with Frank Dunn during a visit to defendant's sister's house;

(2) both defendant and Dunn brought luggage—defendant brought a train case; Dunn brought a tote bag;

(3) because defendant's sister suspected that defendant was abusing drugs, she surreptitiously searched both defendant's and Dunn's luggage, finding only her sister's belongings in the train case and finding only Dunn's belongings in the tote bag;

(4) defendant's sister found cocaine only in Dunn's tote bag;

(5) defendant's sister told police that she found cocaine in Dunn's tote bag but none in defendant's case; and

(6) defendant and Dunn, with their luggage, left the sister's house in defendant's car.

This is the sum total of the evidence from which possession can be inferred. The majority states that this evidence justifies a belief that defendant possessed cocaine and that a warrantless arrest was proper. I cannot agree.

Possession is either actual or constructive. (*People v. Scott* (1987), 152 Ill. App. 3d 868, 505 N.E.2d 42.) A person actually possesses cocaine when it is in that person's manual custody or when the person knows of its existence and has immediate and exclusive control over it. (*People v. Griffin* (1990), 194 Ill. App. 3d 286, 550 N.E.2d 1244.) Possession, however, can be imputed to a person or inferred when that person has exclusive control over the premises where the cocaine was found. (*People v. Evans* (1986), 143 Ill. App. 3d 236, 492 N.E.2d 1036.) This is known as constructive possession. See, *e.g.*, *People v. Scott* (1987), 152 Ill. App. 3d 868, 505 N.E.2d 42 (where this court sustained a conviction of possession because drugs were

found in a dresser drawer shared by both defendant and his girl-friend).

In the case at bar, it is undisputed that defendant did not actually possess the cocaine.

Therefore, the question upon which this case turns is whether the facts support a reasonable inference that the area where the cocaine was found was subject to defendant's exclusive control. Here, the cocaine was in Dunn's bag, not defendant's bag. The only thing defendant did with respect to Dunn's bag was to drive it around in her car. No evidence exists to imply that she knew that Dunn possessed cocaine, and knowledge is the most critical ingredient to the crime of possession. *People v. Truelock* (1966), 35 Ill. 2d 189, 220 N.E.2d 187.

In this case, therefore, there were insufficient facts to support an inference that there was probable cause to believe defendant possessed cocaine. In consequence, the circuit court, in my judgment, correctly quashed the arrest.