THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ELDON D. LUCY, JR., Defendant-Appellee.

Fifth District No. 5—89—0367

Opinion filed October 23, 1990.—Rehearing denied December 3, 1990.

1020

Paula Phillips, State's Attorney, of Effingham (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE WELCH delivered the opinion of the court:

The People of the State of Illinois appeal from a judgment, entered May 22, 1989, granting the motion of defendant, Eldon D. Lucy, Jr., to quash his arrest. Defendant was arrested for the offense of burglary sometime on November 27, 1988. The defendant argues that he was arrested and taken into custody at approximately 11 a.m., when he accompanied police officers to the police department for questioning. The State argues that defendant was not arrested or taken into custody until approximately 2:30 p.m., after he had confessed to the crime. The trial court found that defendant was arrested at approximately 11 a.m., when he accompanied police officers to the police department. The first issue presented by the State for our review is whether the trial court erred in so finding.

The answer to this first issue is relevant to the second issue presented for our review: whether there was probable cause for defendant's arrest at the time of his arrest. If the arrest occurred subsequent to defendant's confession, as the State argues, there can be little doubt that there was probable cause for his arrest. However, the trial court found that the arrest occurred prior to defendant's confession and that, at that time, there was no probable cause for the arrest. The State argues that even at this time there was probable cause for defendant's arrest. Thus, the second issue presented for our review is whether the trial court erred in finding no probable cause for defendant's arrest.

The third issue presented for our review is whether, in the event we hold that defendant's arrest was illegal, this cause must be remanded for a hearing on the separate issue of whether, despite defendant's illegal arrest, his confession was voluntary and admissible under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. Defendant argues that the State has waived this issue for review by failing to request such a hearing before the trial court and that, in any event, the trial court implicitly ruled on this issue when it

granted defendant's motion. Defendant has also filed a motion to strike this third issue from the State's brief for the reason that the State, which, as appellant, has the burden of preparing the record on appeal, is relying on an incomplete record to argue that the trial court did not reach this issue. We have ordered that this motion be taken with the case.

The facts adduced at the hearing on defendant's motion are as follows. The defendant called two witnesses, Sergeant Larry Patton and Detective Leonard Kline, of the Effingham city police department, who testified that on November 27, 1988, they went to defendant's apartment without an arrest or search warrant, that they did not observe defendant engage in any illegal activity, and that evidence was seized and defendant was questioned and arrested. Defendant then rested.

The State called Detective Leonard Kline to testify. Kline testified that he investigated a burglary of Thies' Grocery Store which occurred during the late night hours of November 26, 1988, or early morning hours of November 27, 1988. During that investigation, Kline learned that defendant had been observed by another police officer in the vicinity of the burglary the night it occurred. Kline and Sergeant Larry Patton went to defendant's apartment at approximately 9:30 or 10 the morning of November 27, 1988, to question defendant. The door was opened by Kelly Krone, defendant's girl friend, who, upon being asked if defendant was home, responded that he had gone to the IGA store for a cup of coffee. The officers informed her that they would wait for defendant in the hallway. Someone in the apartment then stated that he would talk to the officers. Kline, who had heard defendant's voice in the past, recognized defendant's voice as that coming from the apartment. The officers were then admitted to the apartment. Defendant was told that there had been a burglary at Thies' Grocery Store, that he had been seen in the area, and that the officers would like to talk to him. Defendant stated that he was not involved in the burglary. Sergeant Patton asked defendant if they could look in his refrigerator. Defendant consented. The refrigerator contained some 2% milk and two cartons of eggs that were the same brand as had been taken in the burglary. At that point, the officers left. They had spent approximately five minutes in defendant's apartment.

The officers went to the grocery store and saw that the price tags used there were similar to those on the milk and eggs found in defendant's apartment. The officers had also called defendant's mother to ask her if she had given defendant any groceries because

defendant had told the officers that his mother had given him the milk and eggs. Defendant's mother denied having given him any groceries.

At approximately 11 a.m., Kline and Patton returned to defendant's apartment to ask defendant and Kelly Krone to go to the police department.

The officers were standing in the hallway outside defendant's apartment when they asked defendant to go to the police department. The officers did not tell defendant that he had to go, but defendant consented. Defendant rode to the police department in Sergeant Patton's squad car.

At the police department, defendant was taken to Kline's office, a room approximately 12 feet by 12 feet. At times the door to the room was closed, at times it was left open. The door was never locked. Defendant was never told that he could not leave or that he was in custody. Kline saw defendant there at approximately 1:50 p.m. After having been advised of his *Miranda* rights by Sergeant Patton, defendant confessed to the crime. Detective Kline then placed defendant under arrest.

On cross-examination, Kline admitted that when he initially went to defendant's apartment, he already considered defendant a possible suspect in the burglary. Both officers were in uniform, armed and driving a marked squad car. Kline did not recall that defendant asked them if they had an arrest or search warrant. Kline did not investigate whether other grocery stores sold the same brand milk and eggs, with similar price stickers, as those found in defendant's refrigerator.

At the police station, defendant asked to speak with his mother, who was called and came down to the station. Defendant was also allowed to speak with his girl friend prior to confessing. Kline denied threatening or coercing defendant in any way to make a statement. Defendant did not display any signs of nervousness or anxiety at any time. Defendant was at the police station two to three hours prior to his arrest. Defendant was given lunch at the police station.

The State next called Sergeant Larry Patton to testify. Patton's testimony was generally consistent with and confirmed Kline's. Patton testified that, the first time they were at defendant's apartment, defendant denied any involvement in the burglary. Patton explained that eggs and milk and other groceries had been stolen and that it was likely that the perpetrator would have such items in his refrigerator. Defendant denied having such items in his refrigerator, but consented to Patton looking.

When the officers returned the second time to defendant's apartment, they informed defendant that they had discovered more information and that they would like defendant to go down to the police department. Defendant consented. Patton offered to let defendant ride with him and defendant agreed. Patton denied that defendant was under arrest. Defendant was not handcuffed or told that he was in custody or under arrest.

Upon arriving at the police department, defendant was taken into Patton's office. Patton read defendant his *Miranda* rights, giving defendant a copy to read along. Patton asked defendant if there was anyone he wanted to talk to and defendant responded that he wished to speak with his mother. Patton did not ask defendant any questions, but contacted defendant's mother. Defendant was left alone with his mother for approximately 10 minutes. After that, Patton was not involved in any further questioning. Patton did eat lunch with defendant and Kelly Krone in the police department lounge. At no time did Patton threaten or coerce defendant in any way. At one point, defendant asked Patton if Kelly would also be in trouble. Patton responded that if she was involved in the burglary, she would be in trouble.

On cross-examination, Patton explained that defendant rode to the police department in the back seat of Patton's squad car. The back doors lock, and a passenger in the back seat cannot open the doors.

In response to the court's questioning, Patton explained that defendant's apartment is located approximately 2½ blocks from the burglarized grocery store. The State rested.

The defendant called Kelly Krone to testify. Kelly testified that on November 27, 1988, she was living with defendant in his apartment. On that morning Officers Kline and Patton came to that apartment and knocked on the door. They asked for defendant. They had neither an arrest warrant nor a search warrant. Kelly told the officers that defendant had gone to the IGA and the officers indicated they would return later. Approximately 10 minutes later the officers returned and again asked for defendant. Kelly told them he was not at home. Patton asked if the shoes on the floor were defendant's and Kelly said yes. Patton asked what shoes defendant was wearing at that moment and Kelly responded a different pair. At that time defendant spoke up and told the officers to enter.

Patton asked defendant if he knew of the burglary and defendant said no. Patton asked if he could look around. Defendant asked if Patton had a warrant. Kelly could not remember Patton's response. Patton asked defendant where he had been at the time of the bur-

glary. Patton had not informed defendant of his *Miranda* rights. Defendant stated that he had gone out that night to the Huck's store. Patton asked defendant if he could look in the refrigerator and defendant said yes. Upon opening the refrigerator, Patton asked defendant where he had gotten the groceries. Defendant responded, at Huck's. Patton encouraged defendant to cooperate, but defendant denied any involvement in the burglary. Patton and Kline left.

Approximately one hour later, Patton and Kline returned to defendant's apartment and asked to speak with defendant. They still had neither an arrest warrant nor a search warrant. Patton asked defendant if he would go to the police station. Both defendant and Kelly agreed. Kelly remembered that both officers were uniformed, but could not remember if they were armed. Kelly rode with Kline in his marked squad car.

At the police station, Kline talked with Kelly about the burglary and defendant's possible involvement in it. Kelly was allowed to see defendant at the police station. Defendant admitted to her that he had burglarized the grocery store and told her that he was going to speak with his mother. Defendant's mother arrived and the three of them talked privately. Defendant seemed scared, shaky and upset. At times defendant cried. Defendant and Kelly were provided lunch. Defendant's shoes had been taken from him.

On cross-examination, Kelly explained that defendant was crying because he felt sorry that he had lied to her about the burglary and not because of anything the police had done. When Kelly and defendant spoke privately, Kelly assured defendant that she was not a suspect in the burglary. Defendant never told Kelly that the police had threatened or pressured him in any way. Kelly advised defendant that he should tell the truth and, if he was guilty, admit it. Defendant agreed that she was right, but stated that he was scared. Kelly was never told that she could not leave the police station, although Kline asked her to stay for further questioning. Kelly did not feel threatened by Kline or Patton.

At defendant's apartment, defendant did initially tell Patton that he could not look in the refrigerator, but later consented when Patton stated that it would be easier if defendant cooperated. Kelly did not hear the officers tell defendant that he was under arrest or threaten him in any way. Kelly went to the police station voluntarily and believed that defendant did too.

On redirect examination, Kelly stated that she did not feel free to refuse to go to the police station. She did not feel free to leave the police station after she got there.

Defendant's mother, Joyce Ann Lucy, testified that on November 27, 1988, she talked with defendant at the Effingham police department. When she arrived at the room in which defendant was, the door to the room was locked. Kelly was in the room with defendant. Defendant had no shoes on. Defendant was upset, emotional, scared and nervous. He was crying. Lucy told defendant that if he was guilty, the best thing would be to admit it.

Defendant suffered from a learning disability and was in special classes in school. He has trouble reading, writing and comprehending. Lucy testified that the police did not call her to ask whether she had given defendant groceries until after defendant was already at the police station.

Defendant testified in his own behalf. At the time of the hearing he was 20 years of age. He had dropped out of school in the tenth grade after being in learning disability and special behavior classes. He had served time in the Department of Corrections for aggravated battery.

On November 27, 1988, Officer Patton came to defendant's apartment. When he entered the apartment, defendant asked him for a search warrant. Patton did not have one. Patton did not advise defendant of his rights before he asked him if he had participated in the burglary. When Patton initially asked to look in the refrigerator, defendant again asked him for a search warrant. Patton told defendant he would leave after he looked in the refrigerator so defendant consented. Defendant said that he had asked Patton and Kline to leave several times. Patton told defendant that he had nothing to fear from him looking in the refrigerator if he was innocent, so defendant agreed. After Patton looked in the refrigerator, the officers left.

Patton and Kline returned later, again without an arrest warrant or search warrant. The officers did not advise defendant of his rights. The officers told defendant that they believed he had committed the burglary and asked him and Kelly to get dressed and go down to the police station with them. Defendant did not know he had a choice to go with them, but felt obligated to do so. Defendant rode with Patton in his marked squad car. Defendant did not feel free to leave. When defendant arrived at the police station, he was not advised of his *Miranda* rights. Defendant told Patton that he wanted to speak with his mother. At first Patton did not want to call defendant's mother and told defendant that he could talk to his mother when Patton was finished questioning him. Patton then attempted to interrogate defendant. Patton told defendant that if he was guilty, whatever hap-

pened to him could also happen to his girl friend, Kelly. Patton finally called defendant's mother's home and spoke to defendant's father. Patton asked defendant's father if he had given defendant any groceries.

Defendant asked Patton if he could see Kelly, and Patton agreed. Defendant also was able to see his mother. Defendant was upset at the time because he felt he was being harassed and his shoes had been taken from him. Defendant had asked for his shoes back but was told that his shoes had enough evidence on them to prove his guilt. Defendant's mother told him that if he was guilty he should just admit it.

Defendant testified that he had asked Patton for a lawyer and Patton had refused. Defendant told Patton he was not going to say anything until a lawyer or his mother was present.

When defendant was finished talking to Kelly and his mother, he and Kelly were taken to a break room. At some point, Patton and Kline took defendant and Kelly back to defendant's apartment to seize the stolen groceries. The officers still had no search warrant or arrest warrant.

Defendant gave a statement to Kline. Kline advised defendant of his right to an attorney, but Kline already knew that defendant had asked Patton for an attorney. Kline proceeded to ask defendant questions anyway. Although defendant signed a waiver of rights form, he had not read it prior to signing it. He had merely glanced at it and did not understand it. Defendant signed a written statement which he did not read prior to signing. He signed the statement because he was scared. He had been told that if he was found guilty, Kelly could also be in trouble. Upon arriving at the police station, defendant had asked Patton if he could leave and Patton said no because they had taken his shoes.

The State called Sergeant Larry Patton in rebuttal. Patton testified that defendant had never asked him for a lawyer. Patton read defendant his rights while defendant read along with his own copy. Defendant signed the waiver of rights form after his rights were read to him. Detective Kline also testified in rebuttal that defendant had never asked him for an attorney.

This concluded the evidence. The court heard oral argument. Defendant argued that he was illegally arrested without probable cause for purely investigative purposes at the time he was asked to accompany the police officers to the police department. Defendant also argued that a confession made after an illegal arrest is not admissible merely because it was made voluntarily, but something more

is required to purge the taint of the illegal arrest. However, defendant did not concede that his confession was voluntary.

The State argued that the police officers did have probable cause to arrest defendant based on what they knew at the time they asked defendant to accompany them to the police station. However, the State did not concede that defendant was arrested at this earlier point in time, but argued that he was not arrested until after he had confessed. The court took the matter under advisement.

On May 22, 1989, the court entered a written order granting the defendant's motion to quash his arrest. In support of its finding that defendant was arrested prior to his confession, the court found the following facts: "The defendant was told to get dressed to come to the station; he was not told he had a choice; he was taken in a squad car separate from his girl friend; he was locked in the back of the car; his shoes were taken from him at the station; the police would not return his shoes on request; and the defendant was not advised he was free to leave. These undisputed facts together with all the facts in evidence persuade the court that an arrest occurred prior to the defendant's statement to the police."

In support of its finding that the police did not have probable cause to effect an arrest at the time the arrest occurred, the court found: "Eggs and milk are common items to be found in many residences. Finding eggs and milk from Thies Grocery Store in a residence located two blocks from the store on the morning after a burglary can hardly be considered unusual. Based on all the evidence the court finds that probable cause did not exist." The court granted the motion to quash the arrest and set the matter for further hearing to determine if the State desired to proceed with the case. Neither the court in its order nor the parties in their arguments addressed the question of whether the quashing of the arrest would also result in the suppression of defendant's confession.

■ The first issue presented for our review is whether the trial court erred in ruling that defendant was arrested prior to his confession when he accompanied the police officers to the police station. A trial court's findings of fact in connection with a motion to quash an arrest will not be disturbed on review unless they are manifestly erroneous. (*People v. Davis* (1986), 142 Ill. App. 3d 630, 636, 491 N.E.2d 1285, 1289, *cert. denied sub nom. People v. Parker* (1987), 479 U.S. 1101, 94 L. Ed. 2d 179, 107 S. Ct. 1327.) We find that the trial court's ruling that defendant was taken into custody prior to his confession is supported by the evidence and not manifestly erroneous.

■ Custodial interrogation on less than probable cause violates

the fourth amendment whether or not the detention has the technical trappings of a formal arrest. (*People v. Davis* (1986), 142 Ill. App. 3d 630, 635, 491 N.E.2d 1285, 1288.) Thus, the question of when defendant was arrested for our purposes is not answered by evidence of the time when defendant was told he was under arrest and booked and fingerprinted. Instead, the test for determining whether a person has been taken into custody is whether it can be said that, in view of all the circumstances surrounding the incident, a reasonable person innocent of any crime would have considered himself under arrest or free to go. (*People v. Hardy* (1986), 142 Ill. App. 3d 108, 117, 491 N.E.2d 493, 500.) This is an objective test, and if a defendant is illegally detained, any consensual aspect of the defendant's conduct in agreeing to accompany the police is eviscerated. (*Hardy*, 142 Ill. App. 3d at 117, 491 N.E.2d at 500.) Not every station house interrogation is so custodial as to indicate arrest. *Davis*, 142 Ill. App. 3d at 636, 491 N.E.2d at 1289.

In the instant case, the trial court found that defendant was taken into custody either at his apartment when he was asked to accompany police officers to the station for questioning or at the station but prior to his confession. Would a reasonable person, innocent of any crime, have believed he was not free to leave at that point in time? The trial court thought so and we cannot say that determination is manifestly erroneous.

■ At the time the police officers asked defendant to accompany them to the station, it was the second time within a few hours that the two officers had been to his apartment investigating the crime. The police officers considered defendant a suspect in the crime. Defendant, who had just arisen from bed, was asked to dress and accompany the officers immediately; he was not asked to meet them at the station at his convenience for questioning. Defendant was placed in the back seat of a police squad car. Once at the police station, according to the police, defendant was advised of his *Miranda* rights and his shoes were taken from him. When defendant stated that he wished to talk with his mother, he was not allowed to leave to do so, but his mother was summoned to the police station. Defendant was not allowed to leave the police station to eat lunch, but had lunch brought to him there by one of the officers. Defendant was never informed that he was free to leave. We think all of these facts, taken together, would lead a reasonable person, innocent of any crime, to believe he was not free to leave and was under arrest. Thus, the trial court did not err in finding that defendant was arrested prior to his confession.

We now must address the question of whether there was probable cause to arrest defendant prior to his confession. The trial court thought not and we agree.

■ Probable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605, 608, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92.) Although mere suspicion is not enough to establish probable cause, neither is evidence sufficient to convict required. *Lippert*, 89 Ill. 2d at 178, 432 N.E.2d at 608.

■ Prior to defendant's confession, the police knew only this: defendant, who lived only 2½ blocks from the burglarized store, had been seen in the vicinity of the store the night of the burglary; defendant's refrigerator contained milk and eggs which were the same brand, with similar price stickers, as those which had been stolen from the burglarized store; and according to the police, defendant's mother had not given defendant the groceries, as defendant had claimed. We hardly think this is enough evidence to establish probable cause to arrest defendant for the burglary of the store. That defendant was seen in the vicinity of the store the night of the burglary means little since defendant lived only 2½ blocks from the store. Similarly, that defendant had eggs and milk in his refrigerator which may have come from the store 2½ blocks from his home is not particularly incriminating. As the trial court pointed out, eggs and milk are items commonly found in people's refrigerators. Finally, that defendant may have lied or been mistaken about whether his mother had given him the milk and eggs is not sufficient to establish probable cause for defendant's arrest. While these facts, taken together, may raise a suspicion of defendant's guilt, they are not sufficient to establish probable cause to believe defendant committed the burglary. The trial court's finding that the police lacked probable cause to arrest defendant prior to his confession is supported by the evidence and is not manifestly erroneous.

■ ■ The third and final issue presented for our review is whether this cause must be remanded for a determination whether, despite defendant's illegal arrest, his confession is admissible under the standard set forth in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254. In *Brown*, the Supreme Court held that a confession is not rendered inadmissible simply because it follows an illegal arrest. Instead, a determination must be made as to whether the

taint of the illegal arrest was so attenuated at the time of the confession as to render that confession admissible despite the illegal arrest. Some of the factors to be considered in making that determination are: whether *Miranda* warnings were given; the temporal proximity of the arrest and the confession; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct. (422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62.) The burden of showing admissibility of the confession rests on the State. 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262.

The State argues in its brief that the trial court made no findings regarding the admissibility of defendant's confession and did not rule on this question. Therefore, the State argues, we must remand this cause to the trial court for such a determination.

■■■ Defendant has filed a motion to strike this argument from the State's brief. We have ordered that this motion be taken with the case. Defendant argues in his motion to strike that docket entries show that two hearings were held subsequent to the hearing on defendant's motion to quash his arrest, that the State, as appellant, has not provided this court with transcripts of those hearings, and that, therefore, we must assume that the trial court did reach the issue of the admissibility of defendant's confession and ruled adversely to the State. However, by order dated August 30, 1990, we granted the State's motion to supplement the record on appeal by filing a transcript of one of those hearings and a court reporter's certificate that no hearing was actually held on the other date. The transcript with which the record was supplemented corroborates the court reporter's certificate that no other hearing was held. It also demonstrates that, at the hearing that was held, the issue of the admissibility of defendant's confession was not raised by either party nor ruled upon by the trial court. It would appear, therefore, that the State has provided this court with a complete record of proceedings before the trial court. It also appears that, indeed, the issue of the admissibility of defendant's confession was not explicitly ruled upon by the trial court. We therefore deny defendant's motion to strike this argument from the State's brief.

■■■ In his brief, defendant renews his argument that the State has failed to furnish a complete record on appeal. Defendant also argues that the State has waived any error with respect to this issue by failing to argue *Brown* before the trial court or request that the trial court make a determination pursuant to *Brown*. While the State may certainly waive arguments by failing to raise them before the trial court (*People v. Dakuras* (1988), 172 Ill. App. 3d 865, 870, 527 N.E.2d

163, 167), this court may review alleged error which was waived by the State under the doctrine of plain error. (*People v. Oswald* (1982), 106 Ill. App. 3d 645, 649, 435 N.E.2d 1369, 1372.) The plain error doctrine will allow us to review an error which, although waived, affects the substantial right of the People. (*Oswald*, 106 Ill. App. 3d at 649, 435 N.E.2d at 1372.) Review under the plain error doctrine is not a matter of right, but is at the discretion of this court. *Oswald*, 106 Ill. App. 3d at 649, 435 N.E.2d at 1372.

██ While we are mindful of the defendant's right to have this cause determined as quickly as possible and at one proceeding, and of the importance of not presenting litigation piecemeal (*People v. O'Neal* (1984), 104 Ill. 2d 399, 408, 472 N.E.2d 441, 445), we find that the People's right to have the trial court make an explicit determination as to the admissibility of defendant's confession is sufficiently substantial to warrant our reviewing this issue despite the State's waiver. A defendant's confession, if voluntary, is one of the most persuasive and reliable forms of evidence. To deprive the People of this piece of evidence would affect their substantial right to completely try the defendant.

██ Finally, defendant directs us to a recent opinion from our supreme court, *People v. Williams* (1990), 138 Ill. 2d 377, which, he argues, holds that the State may not relitigate the issue of the admissibility of a confession under *Brown* where it has failed to raise the issue before the trial court in a timely motion to reconsider. We find *Williams* to be distinguishable on its facts.

In *Williams*, the defendant filed a motion to quash his arrest for lack of probable cause and suppress his confession made after the illegal arrest. The trial court found that defendant had been illegally arrested without probable cause and quashed his arrest. The trial court also, without holding a hearing under *Brown*, suppressed defendant's confession. The State did not prosecute an appeal from this order. However, more than one year later, the State filed a motion asking the trial court to hold a hearing under *Brown* on the question of attenuation. This motion was granted on the ground that the issue of attenuation had not been specifically ruled upon before. After conducting a hearing, the trial court found that defendant's confession was sufficiently attenuated from his illegal arrest to be admitted against him at trial. The cause proceeded to trial, defendant was convicted and he appealed, arguing that the trial court had erred in holding a hearing on the issue of attenuation under *Brown* where the State had not appealed from the original suppression order nor sought reconsideration of that order within the time allowed by law.

Our supreme court held that the State was indeed barred from litigating the issue of attenuation where the suppression order as originally entered was an appealable order from which the State could have appealed. The court held that the attenuation question was part and parcel of the suppression question as originally addressed and could not be severed therefrom and raised at some later point more than one year after entry of the suppression order. The court found that the State either should have sought timely reconsideration of that order or appealed therefrom. The State's failure to do so precluded it from raising the issue more than one year later.

We think *Williams* is distinguishable from the instant case because in the instant case the State did file a timely appeal from the suppression order in which it raised the issue of the trial court's failure to specifically address the question of attenuation. The State is not precluded by the *Williams* decision from raising that issue in a timely appeal.

 The record does not indicate that the trial court made a determination as to the admissibility of defendant's confession under *Brown*, thus raising the possibility that the trial court assumed that the illegal arrest rendered defendant's confession inadmissible. Such an assumption is directly contrary to the decision in *Brown*, which requires a separate determination as to the admissibility of the confession. We therefore remand this cause to the trial court for a determination as to whether, despite defendant's illegal arrest, his confession is admissible under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

For the foregoing reasons, the judgment of the circuit court of Effingham County is affirmed and this cause is remanded for further proceedings not inconsistent with this order.

Affirmed and remanded.

LEWIS, P.J., and RARICK, J., concur.