THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
R.B. (Impleaded), Defendant-Appellant.

First District (6th Division)   No. 1—90—0573

Opinion filed July 31, 1992.

Michael J. Pelletier and Anne E. Meyer, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Janet Mahoney, Special Assistant State's Attorney, and Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial, 15-year-old defendant R.B. was convicted of aggravated battery and armed violence (Ill. Rev. Stat. 1989, ch. 38, pars. 12—4, 33A—2), adjudicated a delinquent and sentenced to a four-year probation term pursuant to the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*). On appeal, defendant raises the following issues: (1) whether an illegal seizure occurred prior to his formal arrest; (2) whether defendant's statement was involuntary; (3) whether the youth officer was a material witness who should have been produced or whose absence should have been explained; and (4) whether defendant was proved guilty beyond a reasonable doubt. Codefendants, defendant's brother Camerino, Bassem Abdallah, Miguel Hernandez, Tony Hernandez and Rudy Hernandez,

were tried separately and are not involved in this appeal. (This court affirmed the conviction of codefendant Bassem Abdallah by Rule 23 order No. 1—90—0792.)

Prior to trial, defendant moved to quash arrest and suppress evidence. At the suppression hearing, the State presented the testimony of the following witnesses: Officers Robert Schaefer, John Bloore, Steven Casto, Richard Vallandigham, William Drish and Assistant State's Attorney Michelle Katz. Their testimony established as follows.

On February 25, 1989, at about 11 a.m., while investigating the homicide of Gonzolo Hernandez and battery of Jose Arellano, Officers Schaefer, Bloore and Casto went to defendant's home in Chicago. The police had been to the home one week before to question defendant's brother Camerino about the attack. Defendant answered the door and admitted the officers. The officers informed defendant that they were investigating the same case and asked defendant if he would accompany them to the Area 1 police station. Schaefer testified that defendant agreed and that Schaefer escorted him to the back of the apartment to get a jacket. The officers asked whether defendant's parents were home and were told that they were not. When the officers told defendant's sister, Olga, that she could come to the station, she responded that she could not leave because she was caring for an infant sibling. Bloore told Olga that defendant was going to the station with them and gave her his business card. The officers escorted defendant outside to the police car, where they questioned him for 15 to 30 minutes about the homicide. Defendant denied any knowledge. The officers drove defendant to Area 1 police station for questioning, picking up codefendant Miguel Hernandez on the way. When they arrived at Area 1 between 1 and 1:30 p.m., the officers took defendant to a small room and began questioning him again about the murder. Schaefer gave defendant a soda and asked whether he was hungry, to which defendant responded negatively. Schaefer then spoke with defendant for 90 minutes about the murder and told him that the police had information that defendant may have been present. At about 2:15 p.m. defendant admitted his presence at the murder, but denied that he shot the deceased. After defendant made this statement, the officers transported him to the Area 3 police station, where the homicide case was assigned, and placed defendant in an interview room. The officers testified that they did not read defendant his rights, nor contact his family or a youth officer before they moved him to Area 3. Bloore, Casto and Schaefer each testified that they did not physically

or psychologically coerce defendant, or witness any other officer doing so.

Upon defendant's arrival at Area 3 between 3 and 3:30 p.m., Vallandigham read defendant his rights, then he and Schaefer questioned defendant further. Vallandigham testified that they still considered defendant a witness, not a suspect. Throughout this questioning, the officers did not handcuff or arrest defendant, and he was free to go, although they did not communicate this to him. Between 3:15 and 3:30 p.m. defendant admitted that he participated in the attack which resulted in the deceased's death. The police informed defendant that he was under arrest and handcuffed him to the wall, and Vallandigham left to get defendant a soda. When Vallandigham saw defendant's 16-year-old brother, Camerino, who had come to the station to look for defendant, Vallandigham took Camerino to the third floor for questioning and subsequently arrested him in connection with this offense. At 3:30 p.m., Officer Bloore telephoned defendant's home and told Olga that they had moved defendant from the Area 1 to the Area 3 police station. The parents were not at home at this time. Vallandigham contacted youth officer Patricia Kos between 4:30 and 5 p.m. Detectives Drish and Conley questioned defendant for 15 to 20 minutes at about 6 p.m. in the presence of youth officer Kos. Assistant State's Attorney Michelle Katz interviewed defendant for 20 to 30 minutes at about 9:30 p.m. in the presence of Drish, Kos, and Assistant State's Attorney Laura Lambur after she informed defendant of his rights and told him that he could be tried as an adult. When she spoke with defendant again at about 11 p.m., defendant indicated that he would give a court-reported statement. Katz testified that she also asked defendant whether he wanted to use the bathroom, or whether he was hungry or thirsty, to which defendant responded in the negative. Defendant gave his written statement at about 12:30 a.m. on February 26, 1989, in the presence of Katz, Lambur, Drish and Kos. At about 2 a.m., defendant read the statement, made several corrections, then signed it.

Defendant testified at the hearing and presented the testimony of his mother, father, sister, brother and Miguel Hernandez.

Defendant testified in his own behalf that he was 15 years old on February 26, 1989. The officers came to his home at about 10 a.m. and entered the home without permission. They told him that they were taking him to the station for questioning. When defendant walked to a back bedroom to get his shoes and sweatshirt, one of the officers followed him. The officers told his sister Olga that they were taking him for questioning. One officer put his arm on defendant's

shoulder, then escorted him to the police car outside in which Miguel Hernandez was waiting. Defendant went voluntarily, but felt that he "didn't have no choice." According to defendant, the police handcuffed him to the wall when they arrived at the station, then handcuffed him to a chair during the questioning. Defendant testified that one of the officers struck him, causing his nose to bleed. Defendant asked to speak to his parents, but the officers did not allow him to call home. After about two hours, the officers took him to the Area 3 police station. Defendant rode in the police car with his hands cuffed behind his back. At the station, he was handcuffed to a pole on the wall and questioned for two hours. He denied involvement in the incident, but the officers refused to accept his answers to their questions and told him to tell the truth. The police then told him that codefendant Miguel Hernandez signed a statement indicating that defendant killed the deceased. At about 5 or 5:30 p.m. the officers told him that he was not going home. The officers told him the facts about the homicide and told him what to tell the assistant State's Attorney. At about 11 p.m., he asked for something to eat, but was refused. When he spoke with Assistant State's Attorney Michelle Katz at about 11:30 p.m., he gave her the answers that the police told him to give. Defendant first saw the youth officer when he gave his written statement. Defendant testified that at about midnight the officers told him that he could call his parents after he made a statement. He did not talk to or see any family members while at either police station. He stated that he asked for something to eat, but that the officers would not give him anything to eat or allow him to make a telephone call until he signed a statement.

Defendant's sister, Olga, testified that on the morning of February 25, 1989, two officers knocked on the door of the family home and entered without invitation. They asked her whether her brother Camerino was home, and she told them that he was not. The officers then said, "Well let's take him," indicating defendant. One of the officers told defendant to get his jacket and shoes, "grabbed him from the shoulder," then walked to a back bedroom with defendant and waited while he got his jacket and shoes. The officers told Olga that they were taking defendant outside to their car to ask him some questions and exited the house with a "tight grip" on defendant's shoulder. They entered the police car, then drove away. The police did not tell Olga where they were taking defendant or give her a phone number or address. In the late afternoon, Olga and Camerino went to two police stations, looking for defendant. Camerino went into the second police station alone, while Olga waited in the car. When Camerino did

not return after one-half hour, Olga entered the station and was told that the police were questioning both defendant and Camerino, and that Camerino would be home about 8 p.m. Olga then returned home.

Miguel Hernandez testified that the police picked him up at his house at about 9 a.m. on February 25, 1989, then drove to defendant's house. The officers picked up defendant and drove them to the police station. The officers did not handcuff defendant or Hernandez while in the car, but handcuffed both of them when they arrived at the station. The officers then questioned defendant and Hernandez separately. Between 2:30 and 3 p.m., the officers took defendant and Hernandez to another police station.

Defendant's mother testified that she and her husband left the house about 9 a.m. on February 25, 1989, to go shopping and returned home around noon. Both of them remained at home for the rest of the day. No police officers telephoned or visited while they were at home. When defendant had not returned by dinnertime, she asked Olga and Camerino to try to locate him.

Defendant's father testified that when he returned home around noon on February 25, 1989, his daughter told him that the police had taken defendant away. He stated that he was home all day and that the police never called the house about defendant. Olga went out to look for defendant, and when she returned between 5 and 6 p.m., she told him that defendant was in the police station at 39th and California.

At the conclusion of the evidence, the trial court denied defendant's motion to quash arrest and suppress evidence. In so ruling, the trial court found that defendant was not under arrest initially; he voluntarily accompanied the officers to the Area 1 station; and he was not arrested until he made an incriminating statement between 3:15 and 3:30 p.m. The trial judge also rejected defendant's argument that youth officer Kos was a material witness.

The following pertinent evidence was adduced at the trial: Jose Arellano testified that on February 19, 1989, at about 12:30 a.m. he and the deceased left a friend's home and walked toward a bus stop near 48th and Ada in Chicago. A gray Chevrolet Impala car stopped and four or five boys exited, screaming gang slogans. Arellano turned and saw the boys coming at him and the deceased with baseball bats. Arellano recognized the two boys holding the bats as Tony and Rudy Hernandez. Tony struck him on the head and arm with a bat, and the other boys attacked the decedent. Arellano did not identify defendant or any of the other codefendants.

Officer Schaefer testified that when he and Officer Bloore went to codefendant Bassem Abdallah's home on February 19, 1989, in connection with their investigation, they observed a gray Chevrolet Impala in front of the house. He returned to Abdallah's home on February 25 and saw the car parked in the garage. Officer Thomas Brankin testified by stipulation that while investigating this case, he went to 48th and Ada Streets in Chicago where he observed a trail of blood and drag marks leading to a nearby garage door.

Assistant State's Attorney Michelle Katz testified that she spoke with defendant in an interview room at the Area 3 police station at about 12:30 a.m. in the presence of youth officer Kos and Detective Drish. Katz advised defendant of his rights, which he indicated that he understood. Defendant then made a statement which a court reporter transcribed. Defendant reviewed the statement, made several corrections, then signed it.

Defendant testified in his own behalf that the contents of his statement were not true, and that although he denied involvement in the homicide, the police did not accept this. He changed his story only after the police told him that codefendant Miguel Hernandez accused him of shooting the deceased. According to defendant, the police supplied the facts contained in the statement. On the night of the attack, defendant was at home watching rented videos. The testimony of defendant's parents corroborated his alibi.

After a trial, defendant was found not guilty of first degree murder and attempted first degree murder, but guilty of armed violence and aggravated battery. The trial court subsequently entered a delinquency finding and sentenced defendant to a four-year probation term.

Initially, we note that this court will not disturb the ruling of a trial court on a motion to suppress unless the decision is against the manifest weight of the evidence. (*People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871.) Custodial interrogation on less than probable cause violates the fourth amendment whether or not the technical trappings of a formal arrest existed. (*People v. Lucy* (1990), 204 Ill. App. 3d 1019, 562 N.E.2d 1158.) Therefore, the question of when defendant was arrested is not answered by evidence of the time when defendant was told that he was under arrest, booked or fingerprinted. (*People v. Lucy*, 204 Ill. App. 3d 1019, 562 N.E.2d 1158.) Rather, the test is whether in view of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.) In this case, it is undisputed that the police

lacked probable cause to arrest defendant when they transported him from his home to the Area 1 police station. Therefore, the question is whether a seizure occurred prior to his formal arrest.

We find the following cases, cited by defendant in support of his claim that his fourth amendment rights were violated, instructive: *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983; and *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33.

In *Dunaway*, the State Police had information that possibly linked defendant to the crime, but had insufficient evidence to get a warrant. The police located defendant at a neighbor's home, drove him to the police station, placed him in an interrogation room and questioned him after advising him of his *Miranda* rights. Defendant waived his right to have an attorney present and eventually made incriminating statements. Defendant was not booked, nor was he told that he was under arrest or that he was free to go. The United States Supreme Court characterized the detention as "in important respects indistinguishable from a traditional arrest" (*Dunaway*, 442 U.S. at 212, 60 L. Ed. 2d at 835-36, 99 S. Ct. at 2256), and held that the police violated the fourth amendment when, without probable cause, they took defendant from his home and transported him to the police station for questioning.

In *People v. Vega*, the police questioned the 16-year-old defendant at the station about a homicide. Several weeks later, they arrived at defendant's home, told him to "get his jacket," and took him to the police station for questioning. They did not ask defendant's mother to accompany them, nor did they indicate that defendant could refuse to go. Defendant testified that he went with the police because he felt "like [he] didn't have a choice." (*Vega*, 203 Ill. App. 3d at 35-36, 560 N.E.2d at 985.) Upon arriving at the station, the officers put defendant into a locked interview room alone. Although the officers testified that defendant was free to go, they never communicated this to him. This court concluded that defendant was seized prior to his formal arrest, relying upon the following factors: he was not questioned at home where he was found; defendant was not told that he could refuse to accompany the officers; he was transported to the police station in the back of a squad car; he was not given the option of arranging his own transportation to the station; he was never informed that he was free to leave; and his age and his lack of extensive experience with the criminal system. Based upon these facts, this court concluded that

an arrest occurred when defendant was initially taken from his home.

In *McGhee*, at about 5 p.m., the police went to the home of defendant's uncle, where the 16-year-old defendant lived, and told defendant about their murder investigation. The officers asked defendant to accompany them to the police station, but did not tell him that he was not required to go. One of the detectives gave his business card to defendant's uncle. The police drove defendant to the station and placed him in an interrogation room. At 6 p.m. defendant was advised of his *Miranda* rights and denied any knowledge of the murder. During a second interview, at 8 p.m., the police again read defendant his rights, then told him that his companion made a statement implicating him. Defendant admitted that he was present, but denied any participation in the murder. At 11 p.m. defendant's mother telephoned the station and spoke to defendant. At 11:30 p.m. she went to the station, but was not allowed to speak with defendant. At 2 a.m. the assistant State's Attorney interviewed defendant after advising him of his rights and telling him that he would be tried as an adult. Defendant persisted in denying participation in the murder. At about 4 a.m. a youth officer was called, and defendant gave a court-reported statement which he reviewed and initialled. This court reversed defendant's conviction and remanded for a new trial, concluding that given the circumstances, a reasonable person would have believed that he was under arrest and that defendant was thus seized within the meaning of the fourth amendment. *McGhee*, 154 Ill. App. 3d at 237, 507 N.E.2d at 36; see also *People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910.

■ Based upon the foregoing authority and an analysis of the relevant factors, and relying only on the undisputed evidence, we believe that the police seized defendant prior to 3:30 p.m. when he was formally arrested. The officers told defendant they were investigating the homicide, then asked him to accompany them to the police station instead of questioning him at his home. Contrary to the State's claim, we are unpersuaded that defendant's safety would have been jeopardized if they questioned him at home. The officers did not tell defendant that he could refuse to accompany them, or give him the option of arranging his own transportation. Defendant stated that he felt that he "had no choice." Moreover, it is undisputed that an officer followed defendant into his bedroom and waited as he retrieved his shoes and sweatshirt. (See *People v. Lucy*, 204 Ill. App. 3d 1019, 562 N.E.2d 1158.) Importantly, the

State did not rebut defendant's and Olga's testimony that an officer "grabbed" defendant's shoulder as they exited the house. The police questioned defendant for 15 to 30 minutes in front of his home, and defendant denied involvement in the attack. The police transported defendant to the station in a squad car, and upon arrival at the station, they put defendant in a small room and questioned him for about 90 minutes about the murder in which he continued to deny involvement. (*Cf. People v. Booker* (1991), 209 Ill. App. 3d 384, 568 N.E.2d 211.) The police abruptly terminated the interrogation when defendant admitted his presence, then transferred defendant to the Area 3 station. Moreover, the record does not indicate that defendant consented to such move, or that he was told he could refuse to go. Further, although the officers testified that defendant was free to leave, they never conveyed this fact to him. (*People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654.) We also consider defendant's age and his lack of extensive experience with the criminal justice system. (*People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635.) Under these facts, we believe that a reasonable person in defendant's situation would not have believed that he could refuse to accompany the police to the station or that he was free to leave once at the station. Even if defendant initially accompanied police voluntarily, we believe that his presence escalated to an involuntary seizure at some point at either the Area 1 or Area 3 police station. (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.) In any event, defendant was illegally seized prior to his formal arrest, and we accordingly reverse the trial court's contrary finding.

The State asserts that even if defendant was illegally arrested or seized, sufficient attenuation existed to purge defendant's statement from the taint of any illegal seizure. We need not address this issue, however, in light of our determination that defendant's statement was involuntary.

Defendant maintains that his statement was involuntary because it was obtained without allowing him to consult with a youth officer or family member and after holding him for more than 15 hours without food and questioning him repeatedly.

Juvenile confessions are to be carefully reviewed to ensure that they are voluntary and not coerced, suggested, or the product of a juvenile's ignorance of rights, his adolescent fantasy, fright or despair. (*People v. Holcomb* (1989), 192 Ill. App. 3d 158, 548 N.E.2d 613; *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179.) The test is whether, under the totality of the circumstances,

the statement was made freely, without compulsion or inducement of any sort (*Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336), with consideration given to the characteristics of the accused and the details of the interrogation. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) Considering the totality of the circumstances, and particularly the absence of a youth officer or parent prior to incrimination, we conclude that the trial court improperly denied defendant's motion to suppress his statement and quash arrest. In so finding, we again rely only on the undisputed evidence.

Section 3—8 of the Juvenile Court Act provides as follows:

> "(2) A law enforcement officer who takes a minor into custody without a warrant *** shall *** immediately make a reasonable attempt to notify the parent *** that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes ***." Ill. Rev. Stat. 1989, ch. 37, par. 803—8(2).

This court has stated that the failure to telephone a juvenile defendant's parents, or the absence of a parent during questioning, is a factor in determining voluntariness, but is not determinative of whether defendant's confession should be suppressed. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984; *In re J.S.* (1984), 121 Ill. App. 3d 927, 460 N.E.2d 412.) However, where the State failed to take appropriate steps to ensure that a juvenile defendant had an opportunity to confer with an interested adult, either a parent or a youth officer, this court has held that the police conduct rendered his confession inadmissible. *People v. Knox* (1989), 186 Ill. App. 3d 808, 542 N.E.2d 910.

We find *People v. Knox* instructive on this issue. In *Knox*, the 15-year-old defendant was lawfully arrested at his home at 9:15 p.m. Although the police told defendant's father that he could accompany defendant to the police station, defendant's father indicated that he could not leave because he was caring for young children. At the station, the police advised defendant of his *Miranda* rights, then interviewed him for about 45 minutes, beginning at 9:45 p.m. Defendant's mother arrived at the station about 10 p.m., but was not permitted to see defendant. At midnight, the police told her that defendant had confessed and that she should go home. An assistant State's Attorney interviewed defendant for 15 to 20 minutes at 1:45 a.m., and defendant signed a written confession at

2:20 a.m. This court reversed the trial court's denial of defendant's suppression motion on the ground that the police failed to exercise "requisite care *** to assure defendant's statement was not free of compulsion." (*Knox*, 186 Ill. App. 3d at 813, 542 N.E.2d at 913.) The court wrote:

> "We are most concerned that defendant's statement was made before defendant had an opportunity to confer, prior to questioning, with an adult interested in his welfare, *either* his parents or a juvenile officer." (Emphasis added.) *Knox*, 186 Ill. App. 3d at 813, 542 N.E.2d at 913.

The court stated that the failure to have a youth officer or parent present is "material to determining the voluntariness of defendant's statement." (*Knox*, 186 Ill. App. 3d at 815, 542 N.E.2d at 915.) In so ruling, the *Knox* court distinguished *People v. Stachelek*. In *Stachelek*, the police arrested the 15-year-old defendant at about 7 a.m., then took him to the police station in investigation of a homicide. He waited in an interview room until about 8:30 a.m. when a youth officer arrived. After he was advised of his *Miranda* rights, and told that he could be tried as an adult, defendant made an oral statement. The youth officer spoke with defendant again at 1 p.m. Defendant gave another oral statement at 3:30 p.m. and gave a written statement at 4:30 p.m. Defendant's parents were not notified of his arrest. This court affirmed the trial court's denial of defendant's suppression motion, rejecting defendant's claim that the failure to notify his parents rendered the circumstances surrounding the interview coercive. The *Knox* court distinguished *Stachelek* on the ground that defendant there conferred with a youth officer before he made any statement, characterizing this distinction as "crucial." *Knox*, 186 Ill. App. 3d at 815, 542 N.E.2d at 914; *Cf. People v. Bobe* (1992), 227 Ill. App. 3d 681; *In re J.S.*, 121 Ill. App. 3d 927, 460 N.E.2d 412.

■ Here, as in *Knox*, defendant did not confer with an adult interested in his welfare before he was questioned or before he made an inculpatory statement. Rather, the evidence reveals that the police interrogated defendant at least three times before they notified a youth officer. Taking the State's evidence as true, a youth officer was not present until 6 p.m., almost four hours after defendant admitted his presence at the attack and three hours after defendant initially incriminated himself. Nor does the State's evidence indicate that Kos ever conferred with defendant, but only that she was present during the interrogations occurring after 6 p.m. The State claims that the police did not contact a youth officer earlier because

the police considered defendant merely a witness, not a suspect, prior to that time. The evidence, however, refutes this claim. When defendant admitted shortly after 2 p.m. that he was present during the attack on the deceased, the police immediately stopped questioning and transferred defendant to the Area 3 police station, where they read defendant his rights, told him that he could be tried as an adult, then questioned him further. Such police conduct belies the State's claim the police treated defendant as a witness. Although the police initially may have considered defendant a witness, their conduct suggests that they considered him a suspect as early as 2 p.m. The police, however, failed to contact a youth officer until 5 p.m., after transfer to the Area 3 police station, after further interrogation, after defendant's inculpatory statement between 3:15 and 3:30 p.m., and after his formal arrest. Nor does the record suggest that a youth officer was unavailable prior to that time. *Cf. People v. Holcomb*, 192 Ill. App. 3d 158, 548 N.E.2d 613.

Moreover, it is undisputed that the police did not attempt to telephone defendant's parents until after defendant incriminated himself, thereby effectively precluding him from conferring with any "adult interested in his welfare" prior to questioning. (*Knox*, 186 Ill. App. 3d at 813, 542 N.E.2d at 913.) At worst, the police purposefully precluded defendant from conferring with a youth officer or his parents until after he made inculpatory statements and was formally arrested. At best, the police simply "subjected defendant to the same routine questioning of a criminal suspect without special regard for his youth." (*Knox*, 186 Ill. App. 3d at 814, 542 N.E.2d at 914.) Either scenario casts doubt upon the voluntariness of defendant's statement. Under *Knox*, defendant's inability to confer with a youth officer or parent prior to incriminating himself is material in determining the voluntariness of defendant's confession.

We conclude that the absence of an adult interested in defendant's welfare contributed to the coercive circumstances surrounding the interrogation. Moreover, although defendant received *Miranda* warnings at about 3 p.m, the record does not support the conclusion that defendant knowingly waived his rights. Nor did defendant sign a waiver of rights form. Defendant was only 15 years old at the time of the interrogation and was questioned repeatedly by several police officers and assistant State's Attorneys at two different police stations. Further, although it appears likely that defendant was the focus of the police investigation, the police lacked probable cause to arrest him. Other factors affecting voluntariness include: lack of food for more than 15 hours (*Reck v. Pate* (1961), 367 U.S.

433, 6 L. Ed. 2d 948, 81 S. Ct. 1541) and extended period of isolation from family and friends (*Ashcraft v. Tennessee* (1944), 322 U.S. 143, 88 L. Ed. 1192, 64 S. Ct. 921). Based upon the above, we cannot say that the totality of these circumstances supports a finding that defendant's confession was neither coerced nor involuntary. Accordingly, the trial court erred in denying defendant's suppression motion.

■ We next consider defendant's claim that he was not proved guilty beyond a reasonable doubt because his confession was unreliable. The State concedes on appeal that the evidence introduced did not establish defendant's presence or participation in the attack, but claims that the independent evidence "substantially corroborated" defendant's statement. In his statement, defendant confessed that he participated in the attack on Gonzolo Hernandez and Jose Arellano. Our review of the record, however, indicates that none of the independent evidence implicates defendant. Although Arellano testified that he and the deceased were attacked by four or five boys, he identified only Rudy Hernandez and Tony Hernandez, and failed to identify defendant or any of the others. Nor did the other State's evidence establish defendant's involvement in the attack. Although their testimony bolstered the circumstances of defendant's confession, the testimony of Officer Schaefer and Detective Brankin failed to affirmatively link defendant with the crime. Without defendant's confession, we believe this record fails to show defendant's guilt beyond a reasonable doubt. Defendant's conviction for aggravated battery and armed violence, therefore, must be reversed.

For the herein stated reasons, defendant's conviction and sentence of probation is reversed.

Reversed.

EGAN, P.J., and RAKOWSKI, J., concur.